**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LYNNWOOD NESTER,<br><br>Plaintiff,<br><br>-against-<br><br>UNITED STATES OF AMERICA;<br><br>MERRICK GARLAND, individually,<br><br>MATTHEW GRAVES, individually,<br><br>and<br><br>JOHN DOES 1-25, individually,<br><br>Defendants. | Civil Action No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff LYNNWOOD NESTER (hereinafter, "Plaintiff" or "Nester") by and through his attorneys, Raiser, Kenniff & Lonstein, P.C. brings this Complaint and respectfully alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for damages arising from Defendants' violations of Plaintiff's rights under the United States Constitution, as well as for tortious conduct actionable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

2. Plaintiff was subjected to selective enforcement, unequal treatment, discriminatory governmental action, and disproportionate exercise of governmental authority based upon his actual or perceived political viewpoints, political associations, and participation in activities associated with January 6, 2021 (hereinafter, the group of people prosecuted for their activities at or near the Capitol Building on January 6th, 2021 will be referred to as the "January 6th Defendants"). Defendants selectively and disproportionately exercised governmental authority against Plaintiff as part of a broader campaign directed at January 6th Defendants. Through retaliatory prosecution, discriminatory detention practices, deliberate indifference to Plaintiff's health and safety, and other unlawful conduct, Defendants violated Plaintiff's constitutional rights and caused severe physical, emotional, reputational, and economic injury.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

4. Jurisdiction over Plaintiff's constitutional claims against individual federal officers is conferred by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), and its progeny.

5. Jurisdiction over Plaintiff's claims against defendant UNITED STATES OF AMERICA (the "United States") is conferred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the act or omission complained of occurred in this District.

7. Plaintiff attempted to file administrative grievances to timely contest his mistreatment while incarcerated at Federal Correctional Institution Fort Dix ("FCI Fort Dix") but prison staff refused to issue Plaintiff the appropriate grievance forms. Accordingly, Plaintiff was unable to file the appropriate grievance forms while Plaintiff was incarcerated at Fort Dix.

8. On or about August 6, 2025, Plaintiff transmitted two administrative Notices of Claim to the United States Department of Justice ("DOJ") setting forth the factual basis for his claims and demanding a sum certain. More than six months elapsed without final denial.

9. As of the date of this Complaint, the United States failed to settle or issue a final denial of Plaintiff's claims within the statutory period. More than 180 days had elapsed, resulting in constructive exhaustion under 28 U.S.C. § 2675(a).

## PARTIES

10. Plaintiff is a United States citizen and resident of York County, State of Pennsylvania.

11. Defendant UNITED STATES OF AMERICA is sued pursuant to the FTCA for tortious acts and omissions of federal employees acting within the scope of their employment.

12. Defendant MERRICK GARLAND ("Garland") is sued in his individual capacity for actions taken while serving as Attorney General of the United States.

13. Defendant MATTHEW M. GRAVES ("Graves") is sued in his individual capacity for actions taken while serving as United States Attorney for the District of Columbia.

14. JOHN DOES 1-25, individually, include but are not limited to unknown agents, officers, employees, supervisors, policymakers, prosecutors, public-affairs personnel, and other officials of the United States Department of Justice, the United States Attorney's Office for the District of Columbia, and/or the Federal Bureau of Investigation who personally participated in, directed, approved, ratified, supervised, or knowingly permitted the investigative, public-facing, charging, prosecutorial, search, arrest, or other law-enforcement actions complained of herein.

## FACTUAL ALLEGATIONS

15. Prior to January 6th, 2021, Plaintiff lived an ordinary and law-abiding life in central Pennsylvania. After graduating from high school, Plaintiff spent approximately thirty years working in his family's welding business before being recruited to work in the archery department of a local sporting goods store because of his knowledge, experience, and passion for competitive archery. Plaintiff maintained a modest lifestyle, owned his home, and remained closely connected to the community in which he had spent virtually his entire adult life.

16. Plaintiff was deeply involved in civic life long before the events giving rise to this action. He served as a local party committeeperson, a township planning commission member, an election worker, and a poll watcher. Following the 2020 Pennsylvania primary, Plaintiff became interested in election administration and devoted substantial time to learning the election process. Rather than promoting unfounded allegations of fraud, Plaintiff shared information learned through poll-worker training in an effort to dispel misconceptions, communicated with election officials and state legislators regarding perceived procedural improvements, and sought to increase public confidence in the electoral process through lawful civic participation.

17. Prior to January 6th, 2021, Plaintiff had never been convicted of a crime.

18. On January 6th, 2021 a joint session of the United States Congress convened at approximately 1:00 p.m. to certify the Electoral College vote of the 2020 Presidential Election.

19. On that day, Plaintiff, a 57-year-old man, was present in Washington, D.C. to exercise his First Amendment rights by attending a political rally and protesting the certification of the Electoral College vote.

20. Plaintiff, who was walking with a cane, entered the Capitol building through an open door, wandered around for about ten minutes, and left.

21. Plaintiff engaged in no violence, caused no damage, and took nothing with him.

22. To the extent he can even be considered to have participated in the events of January 6th, 2021, Plaintiff was one of the least belligerent participants.

23. Nonetheless, Plaintiff was arrested for these actions on May 20, 2022, over a year after the events occurred.

24. Plaintiff's arrest was effectuated by eight armed officers who approached his home with guns drawn, an arrest that is highly disproportional for the various nonviolent misdemeanors with which Plaintiff was charged.

25. Plaintiff was criminally prosecuted in the United States District Court for the District of Columbia under Case No. 22-cr-183.

26. Plaintiff was charged with violation of:

a. 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds

b. 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building

c. 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building

d. 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building

27. All of the counts Plaintiff was charged with were misdemeanors. Plaintiff was not accused of violence, property damage, theft, or any of the other behavior that came to categorize many of the other January 6th Defendants.

28. Plaintiff sought to resolve his criminal case without contesting the charges and wanted to avoid the spectacle of a criminal trial. Plaintiff was willing to accept criminal judgment, but wanted to bring his criminal proceedings to a prompt resolution. Accordingly, Plaintiff attempted to plead *nolo contendere* to all counts. However, the government refused to accept Plaintiff's plea offer and insisted on proceeding to a public trial.

29. The Court agreed with the government and refused to accept Plaintiff's plea, stating that *nolo contendere* pleas had not been accepted in prior January 6th prosecutions and it was not a sufficient acceptance of responsibility.

30. Plaintiff's jury trial commenced on March 4, 2024, the same date previously scheduled for the commencement of former President Donald Trump's criminal trial before the same judge, Judge Tanya Chutkan. Mr. Trump's criminal trial was delayed because the Supreme Court was reviewing Judge Chutkan's rejection of the former President's claim of immunity for his actions on January 6th (the Supreme Court would later reverse Judge Chutkan's order). Plaintiff, a first-time misdemeanor defendant, now occupied that place on the court's calendar instead.

31. On March 7, 2024, after a four-day jury trial, Plaintiff was convicted of all four misdemeanor charges.

32. On July 1, 2024, the Supreme Court reversed Judge Chutkan's rejection of President Trump's immunity defense in his criminal case, holding that Presidents enjoyed "absolute immunity" for their "official" actions. The criminal action was remanded back to Judge Chutkan. It was widely understood that the Supreme Court's decision made it substantially more difficult to prosecute President Trump for his actions on January 6th.

33. On July 19, 2024, Plaintiff was sentenced to a total of ten months' incarceration.

34. During sentencing, Judge Chutkan expressly recognized that Nester committed no violence, property damage, or theft, and had no prior criminal history. Judge Chutkan further stated that she did not expect Nester to re-offend, Nester did not need to be rehabilitated, and that she fully expected Nester would remain a productive citizen.

35. Regardless, Judge Chutkan justified a prison sentence for Nester based on the general conduct of the other protesters present on January 6th, 2021. Judge Chutkan relied on the attempt to overthrow the government, the need to preserve democracy and future elections, and the need for future deterrence of events such as January 6th, specifically referencing future elections. In fact, former President Donald Trump was a candidate in the upcoming Presidential election.

36. These broad governmental interests were used to impose a sentence of ten months' imprisonment on a first time offender convicted of nonviolent misdemeanors.

37. Upon information and belief, Defendants' refusal to resolve this straightforward misdemeanor prosecution without a public trial, coupled with their reliance upon broad societal interests such as deterrence and preserving future elections rather than Plaintiff's own conduct and characteristics, reflected a broader policy of using selected January 6th prosecutions to

communicate governmental messages extending beyond the adjudication of individual criminal liability.

38. Plaintiff served his sentence at FCI Fort Dix, a low-security federal correctional institution.

39. Upon information and belief, Plaintiff served his sentence at a low-security institution instead of a minimum-security camp, despite being convicted of only nonviolent misdemeanors, because he was labeled a domestic terrorist and was thus disqualified from being sent to a minimum-security camp. Otherwise, Plaintiff's Custody Classification score would have qualified him for a minimum-security camp.

40. While at FCI Fort Dix, Plaintiff was subjected to inhumane conditions, including exposure to mold, poor sanitation, deprivation of hygiene services, denial of visitation rights, and unlawful confiscation of personal funds for restitution he already paid in full prior to being incarcerated.

41. While at FCI Fort Dix, Plaintiff was housed in units with severe insulation problems and visible toxic mold, resulting in physical discomfort and increased health risks.

**THE GOVERNMENT'S JANUARY 6 ENFORCEMENT CAMPAIGN**

42. Following January 6, 2021, the United States Department of Justice publicly announced that the investigation and prosecution of January 6th Defendants would constitute one of the largest criminal enforcement efforts in the history of the Department.

43. At all relevant times, Defendant Merrick Garland served as Attorney General of the United States and exercised supervisory authority over Department-wide policies concerning January 6 investigations and prosecutions.

44. At all relevant times, Defendant Matthew Graves served as United States Attorney for the District of Columbia and exercised supervisory authority over January 6 prosecutions within the District of Columbia.

45. Throughout their respective tenures, Garland and Graves repeatedly described January 6 prosecutions as among the Department's highest priorities and publicly emphasized the importance of those prosecutions in official statements, media appearances, congressional testimony, and Department of Justice communications.

46. Upon information and belief, Garland and Graves approved, implemented, supervised, ratified, or knowingly permitted investigative, charging, detention, plea-negotiation, sentencing, and appellate policies applicable to January 6th Defendants, including Plaintiff.

47. Plaintiff alleges that these policies subjected January 6th Defendants, including Plaintiff, to materially harsher investigative, charging, detention, and sentencing practices than similarly situated criminal defendants and were intended, at least in part, to maximize deterrent effect and public example-making.

**AS AND FOR A FIRST CAUSE OF ACTION**

*Fifth Amendment Equal Protection* – Bivens
*Selective Enforcement, Viewpoint Discrimination, and Unequal Treatment*
*Federal Individual Defendants*

48. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

49. Defendants Garland and Graves (the "DOJ Defendants") intentionally treated Plaintiff and similarly situated January 6th Defendants differently from other criminal defendants.

50. The DOJ Defendants pursued unusually severe charging decisions, detention positions, incarceration practices, and prosecutorial strategies against Plaintiff, a non-violent first-time offender charged with four misdemeanors, because of his actual or perceived political beliefs, associations, and viewpoints.

51. Upon information and belief, the DOJ Defendants personally participated in, approved, implemented, supervised, ratified, or knowingly permitted DOJ-wide policies and practices that treated January 6th Defendants differently from similarly situated criminal defendants.

52. Upon information and belief, the DOJ Defendants approved, implemented, supervised, or ratified charging practices, detention positions, and litigation strategies intended to maximize deterrent effect, public example-making, detention exposure, and sentencing exposure against January 6th Defendants, including Plaintiff. Upon information and belief, Plaintiff's actual conduct was not the sole or primary reason for the investigative, prosecutorial, and litigation positions taken in his case. Rather, Defendants believed Plaintiff's prosecution possessed enhanced symbolic value because he was perceived as part of the January 6th movement and sought to use his case to communicate governmental condemnation of that movement as a whole.

53. Upon information and belief, the DOJ Defendants received regular briefings concerning January 6th investigations and prosecutions, were aware of the policies challenged herein, and knowingly permitted those policies to continue.

54. No sufficient governmental interest justified the disparate treatment imposed upon Plaintiff.

55. In the alternative, the DOJ Defendants lacked any rational basis for treating Plaintiff differently from similarly situated defendants prosecuted for comparable conduct.

56. The DOJ Defendants' conduct violated the equal protection component of the Fifth Amendment.

57. As a direct and proximate result of the DOJ Defendants' actions, Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, and other damages.

**AS AND FOR A SECOND CAUSE OF ACTION**

*Negligence – FTCA*
*Defendant United States of America*

58. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

59. This cause of action is asserted solely against Defendant United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.

60. At all relevant times, employees, agents, officers, and servants of the Federal Bureau of Prisons and the United States Department of Justice were acting within the scope of their employment.

61. Defendant United States, through its employees and agents, owed Plaintiff a duty to exercise reasonable care for his safety, health, custody, property, and well-being while he was confined in federal custody.

62. Defendant United States further owed Plaintiff a duty to maintain reasonably safe and sanitary conditions of confinement, to protect Plaintiff from foreseeable harm, to properly administer inmate funds and property, and to comply with applicable policies governing inmate health, safety, sanitation, and institutional operations.

63. During Plaintiff's confinement at FCI Fort Dix, Defendant United States, through its employees and agents, failed to exercise reasonable care in the operation, maintenance, supervision, and administration of the institution.

64. Among other things, Defendant United States permitted Plaintiff to be housed in conditions that were unsanitary, unhealthy, unsafe, and unreasonably hazardous.

65. Upon information and belief, those conditions included the presence of mold, inadequate sanitation, inadequate maintenance of living areas, exposure to environmental hazards, and other conditions creating unreasonable risks to inmate health and safety.

66. Plaintiff repeatedly complained of such conditions through institutional channels, grievances, requests, and communications with prison staff.

67. Despite actual or constructive notice of those conditions, Defendant United States failed to take reasonable measures to correct, remediate, investigate, or otherwise address the hazards to which Plaintiff was exposed.

68. Defendant United States further failed to properly safeguard, account for, administer, or return certain inmate funds, property, and financial resources belonging to Plaintiff.

69. Defendant United States further failed to properly supervise, train, monitor, and manage employees responsible for Plaintiff's confinement and care.

70. The acts and omissions described herein constituted negligence under the law of the jurisdiction in which the conduct occurred.

71. As a direct and proximate result of Defendant United States' negligence, Plaintiff suffered physical injury, emotional distress, pain and suffering, loss of property, economic damages, loss of enjoyment of life, and other compensable injuries.

72. Plaintiff has satisfied all jurisdictional prerequisites required under the Federal Tort Claims Act, including presentment and exhaustion, or is otherwise deemed to have constructively exhausted such remedies pursuant to law.

**WHEREFORE**, and for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in the Plaintiff's favor,

a. Awarding compensatory damages to the Plaintiff, plus post-judgment interest;

b. Awarding punitive damages to the Plaintiff;

c. Awarding Plaintiff reasonable costs, disbursements, and attorney's fees; and

d. Awarding any such other and further relief as this Court finds is required in the interest of justice.

Dated: September 25, 2026

Respectfully submitted,

/s/*Alexander Lonstein*
Alexander Lonstein
RAISER, KENNIFF &
LONSTEIN, P.C.
99 Park Avenue, Suite 1530
New York, NY 10016
alexander@rkl.law